AMERICAN TEXTILE WOOLEN COMPANY ET AL.,[1] PETITIONERS, *v.*
COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.
AMERICAN TEXTILE WOOLEN COMPANY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 9689, 20921.   Promulgated June 12, 1931.

*J. Robert Sherrod, Esq.*, and *George M. Wolcott, Esq.*, for the petitioners.

*Harry Leroy Jones, Esq.*, and *A. H. Willey, Esq.*, for the respondent.

---

[1] Sweetwater Woolen Mills, Athens Woolen Mills, Park Woolen Mills, and Louisville Woolen Mills, subsidiaries of the American Textile Woolen Company, joined as appellants in Docket No. 9689.

OPINION.

Love: We agree with the parties that the subsidiaries of petitioner are not proper parties to proceeding, Docket No. 9689, and accordingly orders will be entered dismissing that proceeding in so far as it relates to them. *American Creosoting Co. et al.,* 12 B. T. A. 247.

With respect to the year 1919, the deficiency letter in form advises of the determination of an overassessment in the amount of $118,829.76. This determination was arrived at by subtracting the

correct total consolidated income and profits taxes, in the amount of $224,372.70, from the total amount of the assessments previously made against the petitioner and the four subsidiaries on both their separate and consolidated returns, which assessments totaled $343,202.46. The parties have stipulated that the substantive effect of the said determination for the year 1919 is to assert a deficiency against petitioner in the amount of $38,990.79, i. e., the difference between the correct total consolidated tax liability, amounting to $224,372.70, as indicated by the deficiency letter, and the total consolidated tax liability as reported on the consolidated return, which amount was $185,381.91. The Board therefore has jurisdiction of the proceeding as it relates to the year 1919. See *George M. Cohan*, 11 B. T. A. 743.

The respondent admits error with respect to the year 1917 in the assertion against ·petitioner of liability for the deficiencies of its subsidiaries in income tax, since there is no provision of law or regulations respecting the consolidation of income tax for that year. See Regulations 41, article 78; Regulations 33, article 199; section 1331, Revenue Act of 1921; T. D. 3389; *Trustees for Ohio & Big Sandy Coal Co. et al.*, 15 B. T. A. 273; and *Union Pacific Railroad Co.*, 17 B. T. A. 793. See also *Morris County Crushed Stone Co. et al.*, 6 B. T. A. 800, 812.

Upon hearing, petitioner abandoned all allegations of error with respect to the years 1920 and 1921, Docket No. 20921, except in so far as adjustments of consolidated invested capital may result from our determination of tax liability for the years 1917, 1918 and 1919.

Petitioner has further abandoned all allegations of error respecting the years 1917, 1918 and 1919, except those relating to the respondent's allocation to it of the entire consolidated profits tax for the year 1917 and the entire consolidated income and profits taxes for the years 1918 and 1919.

The Revenue Act of 1917, under which income and profits taxes for 1917 were imposed, contained no provision in respect of consolidated returns of affiliated corporations. Such provisions were first found in articles 77 and 78 of Regulations 41, issued under authority of section 213 of that act. They provided:

Art. 77. *When affiliated corporations must furnish information as to intercorporate relations.*—For the purpose of the excess profits tax every corporation will describe in its return all its intercorporate relationships with other corporations with which it is affiliated, and will furnish such information in relation thereto as will enable the Commissioner of Internal Revenue to compute the amount of the tax properly due from each corporation on the basis of an equitable and lawful accounting.

For the purpose of this regulation two or more corporations will be deemed to be affiliated (1) when one such corporation owns directly * * * substantially all the stock of the other or others * * *.

Art. 78. *When affiliated corporations may be required to make consolidated return.*—Whenever necessary to more equitably determine the invested capital or taxable income, the Commissioner of Internal Revenue may require corporations classed as affiliated under article 77 to furnish a consolidated return of net income and invested capital  *  *  *.  In cases where consolidated returns are accepted, the total tax will be computed in the first instance as a unit upon the basis of the consolidated return and will be assessed upon the respective affiliated corporations in such proportions as may be agreed among them. If no such agreement is made the tax will be assessed upon each such corporation in accordance with the net income and invested capital properly assignable to it.

In the Revenue Act of 1918 Congress substantively adopted the said articles as section 240 (a), which provides:

That corporations which are affiliated within the meaning of this section shall, under regulations to be prescribed by the Commissioner with the approval of the Secretary, make a consolidated return of net income and invested capital  *  *  *  and the taxes thereunder shall be computed and determined upon the basis of such return  *  *  *.

In any case in which a tax is assessed upon the basis of a consolidated return the total tax shall be computed in the first instance as a unit and shall then be assessed upon the respective affiliated corporations in such proportions as may be agreed upon among them, or in the absence of any such agreement, then on the basis of the net income properly assignable to each.

(b) For the purpose of this section two or more domestic corporations shall be deemed to be affiliated (1) if one corporation owns directly or controls  *  *  *  by a nominee or nominees substantially all of the stock of the other or others  *  *  *.

Some doubt having arisen as to the validity of article 77 of Regulations 41, applicable to the year 1917, Congress undertook to ratify that article in section 1331 of the Revenue Act of 1921, which provides:

(a) That Title II of the Revenue Act of 1917 shall be construed to impose the taxes therein mentioned upon the basis of consolidated returns of net income and invested capital in case of domestic corporations  *  *  *  during the calendar year 1917.

(b) For the purpose of this section a corporation  *  *  *  was affiliated with one or more corporations  *  *  *  (1) when such corporation  *  *  *  owned directly or controlled through closely affiliated interests or by a nominee or nominees all or substantially all the stock of the other or others.  *  *  *

(c) The provisions of this section are declaratory of the provisions of Title II of the Revenue Act of 1917.

This ratification clearly covers article 77, but contains no expression specifically applicable to article 78. Subsequent to the passage of the 1921 Act, the Treasury Department issued Treasury Decision 3389 (24 T. D. 1126) whereby articles 77 and 78 of Regulations 41 were amended. The amendments are not material here, but are mentioned as indicating the perpetuation of article 78 of Regulations 41 under section 1331 of the 1921 Act.

Petitioner contends that because section 1331 expressly ratified the provisions of article 77 of Regulations 41, and made no mention of its companion article, article 78, it is to be inferred that Congress did not consider article 78 as the intended construction of Title II of the 1917 Act. It would follow that there was no provision in law or lawful regulations for the allocation of the profits taxes to the several members of an affiliated group upon any basis other than that of the proportion which the net income of each bore to the consolidated net income. This would mean that even the affiliated corporations themselves could not by agreement determine the allocation of the tax among them upon any other basis. Allocation of the tax in the manner mentioned would be necessary however, since, under section 29 of the Revenue Act of 1916, as added to by section 1211 of the Revenue Act of 1917, the profits tax was allowed as a credit in the computation of the income tax under the 1917 Act.

Petitioner's objection to the respondent's allocation of the tax involved in the present proceeding appears therefore to rest upon the theory that Congress disclaimed article 78 of Regulations 41 by failing to specifically include it in the declaratory provisions of section 1331 of the 1921 Act. There has been no questioning in this proceeding of the right of Congress to provide for allocation of the tax as it did in the 1918 Act. The adoption of the provisions of article 78 in section 240 (a) of the 1918 Act was a legislative recognition that its provisions were necessary to collect the tax imposed by the act. This being so, the provisions of those articles obviously were equally necessary to the collection of similar taxes imposed by the Revenue Act of 1917.

Considering the above, we are of opinion that article 78 of Regulations 41, and the said article as amended by T. D. 3389, is a proper regulation within the intent of Title II of the Revenue Act of 1917.

We must look further to determine whether or not the respondent's application of article 78 in the present case was proper. This is a question of whether or not there existed among this petitioner and its subsidiaries an agreement for the allocation of the consolidated profits tax of the group for the year 1917 upon a basis other than in accordance with the net income and invested capital properly assignable to each member of the group. For the years 1918 and 1919, the sole issue is the same as that now under discussion in relation to the year 1917, except that for the two latter years both income and profits taxes are involved.

In *Cincinnati Mining Co.*, 8 B. T. A. 79, we held, under section 240 (a) of the 1918 Act, that in the absence of an agreement among members of an affiliated group "it is mandatory upon the respondent to assess the tax upon the basis of the net income properly assignable to each."

Petitioner denies the existence among the members of its affiliated group of any agreement for the allocation of the taxes for the years 1917, 1918 and 1919. The respondent contends that there was either an expressed or implied agreement that the entire consolidated profits tax of the group for the year 1917, and the consolidated income and profits taxes for the years 1918 and 1919, should be allocated to petitioner.

In *Essex Coal Co.*, 12 B. T. A. 994, 998, we discussed the nature of the agreement referred to in section 240 (a) of the 1918 Act, saying:

The agreement referred to in this statute is one between the corporations included in the consolidated return. It is not required to be in writing or to be in any particular form or language. Such a contract may be implied as well as expressed. Such an agreement does not relate to the payment of the tax but only to its assessment. Whether such an agreement was made may be shown by circumstantial evidence and the conduct of the parties as well as the testimony of witnesses. Here the officers of the two corporations were the same individuals. The individual who represented and acted for one company as president, acted in the same capacity for the other. An agreement between the said officers in one capacity and the same individuals in another capacity might have been a mere mental process evidenced only by the outward acts and conduct of the parties. It would have been a useless process for the president of one company to agree with himself as president of another company, and for the other officers in their respective capacities to agree with themselves by any express language. An agreement which is inferred from the acts and conduct of parties is just as effective as any other kind of an agreement.

We think that this case is governed by the principles set forth in the case of *In re Temtor Corn & Fruit Products Co.*, 299 Fed. 326, wherein the court stated:

It is finally contended on behalf of the trustee in bankruptcy that, even though the tax here in question was properly computed on the basis of the consolidated return, the government in making the assessment should have apportioned the tax between the two companies, as provided in section 240 of the Revenue Act of 1918. The evidence shows that the tax was computed as a unit, and was not apportioned, but was all assessed against the Temtor Company. Under the statute it was proper for the two corporations concerned to agree as between themselves as to the proportion of the entire tax to be assessed against each. As the entire tax appears to have been assessed against the Temtor Company, and as that company, without objection or request for an apportionment, paid three quarterly installments of the tax, it must be inferred that both companies agreed to the assessment as made. As already stated, the companies had practically the same officers and directors, and the course followed by them was the legal equivalent of an agreement and request that the entire tax be assessed against the Temtor Company. In the present posture of the case, I do not think it is open to either company to object to the course taken by the government in assessing the tax.

Considering all the evidence in the case, it is our opinion that an agreement was entered into between the two corporations to the effect that the total tax might be assessed against the petitioner. It is immaterial how the parties actually paid the tax or how they agreed the tax should be paid. We are

concerned here only with the question as to how it should be assessed. In a consolidated group the tax may well be assessed against the parent or principal company and the subsidiaries contribute to the parent company their proportionate part of the tax. The fact that they do contribute their proportionate part of the tax does not indicate that it was not to be assessed against one of the companies.

We do not think that the statement contained in Form 1122 filed for the previous year with respect to the assessment of the tax has any relation or evidentiary value for the purpose of showing that the same agreement was effective for the taxable year. On the other hand, if it has any weight at all, it supports the conclusion that we have reached that there was an agreement or understanding that the entire tax should be assessed against the petitioner for the taxable year. For the previous year when there was no such agreement or understanding to the effect that the entire tax should be assessed against the petitioner, the Commissioner was notified in that form to assess the tax as therein stated, that is, against both companies. No such form, statement or information was conveyed to the Commissioner with respect to the taxable year. On the other hand, the acts of the parties and the other circumstantial evidence convince us that there was an understanding or agreement between the two corporations that the entire tax should be assessed against the petitioner for the taxable year.

We have considered the decision of the Circuit Court of Appeals for the Sixth Circuit, 39 Fed. (2d) 892, reversing our determination in the *Essex* case, *supra*. We are of opinion, however, that the principle laid down in the determination mentioned is sound and that the court's decision is only that the facts presented did not warrant our conclusion that an agreement for allocation of the tax existed among the corporations therein involved. In the instant case we believe that the facts demonstrate the existence of such an agreement and that the tax should be allocated in accordance with it, even though it does not appear that the agreement was in writing or that the respondent was given express notice of it. Cf. *Woodside Cotton Mills Co.*, 13 B. T. A. 266. In the decision mentioned the Circuit Court said:

The only questions involved are: Whether the facts support the conclusions of the Board of Tax Appeals that there was an understanding or agreement between these affiliated companies to the effect that this deficiency in tax should be assessed against the petitioner and whether the petitioner is estopped from denying the existence of such an agreement. * * *

    *        *        *        *        *        *        *

It is conceded that no agreement between the petitioner and its affiliated company was filed with the consolidated return for 1920, nor was Treasury Department form 1122 filed by the Lost Run Coal Company. The petitioner contends that where no such agreement or form is filed, it becomes the duty of the Commissioner to apportion the tax liability on the basis of the net income properly assignable to each of the affiliated companies. The basis of the Board of Tax Appeals finding is that the failure of the petitioner to protest against the Commissioner's assessment of the tax against it, and its failure to take any action with respect to notices and demands for payment of the installments directed to it, in view of the close relationship of the affiliated companies, justify the conclusion that an implied agreement existed between the

affiliated taxpayers that the assessment of all taxes should be made against the Essex Coal Company, relying upon the principle set forth in *In re Temtor Corn & Fruit Products Co.*, 292 Fed. 326, affirmed, *sub nom. Schlafly* v. *United States*, 4 Fed. (2d) 195 (C. C. A. 8th).

We think Section 240 (a) of the Revenue Act of 1918 and Article 632 of Regulation 45 prescribed thereunder by the Commissioner of Internal Revenue clearly contemplate some specific notice to the Commissioner of an agreement between the affiliated corporations filing the consolidated return as to the proportion of tax which is to be assessed upon the respective corporations, in the absence of which the Commissioner shall assess the tax on the basis of the net income properly assignable to each affiliated corporation. Mere failure to object to the assessment of the whole additional tax against the petitioner cannot be construed as an implied agreement to be so taxed. When no agreement among the affiliated corporations appeared, it became the duty of the Commissioner to apportion the assessment, and his failure to do so cannot be said to be excused by the neglect of the taxpayer to remind him of such duty. We do not think the Commissioner can, by assessing the whole tax upon one of the affiliated companies, require affirmative action upon the part of the taxpayer in denying that any agreement exists and thus create an implied agreement. Whether an agreement between or among the affiliated corporations is to be assumed depends upon the initial action of filing the consolidated return. If the subsequent conduct or non-action of the taxpayer is to be made the test of what was intended at the time of filing the return, no certainty could be had in any case.

In the *Temtor* case, *supra*, relied upon by the Board of Tax Appeals, the referee in bankruptcy held that the payment of three quarterly installments of the tax, without objection or request for an apportionment by the affiliated company against which the tax was assessed, justified an inference that the corporations had agreed to the assessment so made. If the payment of installments of the tax by one or the other of the affiliated companies is important in determining whether an agreement exists between them, here the taxpayers each paid two equal installments and one-half of the tax. In the case of *Popular Price Tailoring Company* v. *Commissioner of Internal Revenue*, 33 Fed. (2d) 464, cited by the Commissioner, the court bases its opinion upon the finding of the Board of Tax Appeals in this case, with which we find ourselves unable to agree. Besides, that case involved acquiescence for five years in the payment of the whole tax by one company.

The statute clearly contemplates the existence of an agreement, or the absence of one, at the time of the filing of the return and the making of the assessment. The consolidated return shows no agreement between the affiliated companies respecting assessment, nor was any form 1122 filed as provided by the regulation of the Commissioner, and the Commissioner therefore was not authorized to infer the existence of an agreement from other evidence or from the subsequent conduct or non-action of the taxpayer assessed.

Nor do we think the petitioner estopped from denying the existence of an agreement between the affiliated companies. The Commissioner knew that no agreement between the affiliated companies was filed with the consolidated return and that in the absence the law directed him to assess the total tax on the basis of the net income properly assignable to each of the affiliated corporations. Under such circumstances it cannot be said that the Commissioner had the right to rely upon the subsequent conduct of the taxpayers in determining how the tax should be assessed. But the petitioner and its affiliated corporation, in failing to file an agreement with their consolidated return,

disclosed their intention and purpose with respect to the assessment of the tax; no other facts were necessary for the Commissioner's action and he cannot create an estoppel by his own failure to perform the act directed by the plain provisions of the law. Every fact necessary to be known for the performance of his duty was within his knowledge when the return was filed.

We think there was no evidence to support the Board's findings, and no estoppel. * * *

In the instant case information returns were filed by three of the subsidiaries for the year 1919, and for all four of them for the years 1920 and 1921. Two of the three information returns for 1919 left the space designated for statement of the amount to be assessed against them blank. In the information returns for the years 1920 and 1921, the word "none" was inserted in each instance in the space provided for statement of the amount to be assessed against the filing corporation. The information return of the Park Company for 1919 designated the amount which it desired to have assessed against it. This is the only instance in the whole record in which such a designation appears.

In the *Essex* case, *supra*, the Circuit Court points out the fact that the two affiliated corporations each paid two equal installments and one-half of the tax, i. e., the tax shown due on the return. In this proceeding it appears that all payments made upon the consolidated returns involved were made by the petitioner, even though in one instance one of the subsidiaries furnished the money with which such a payment was made.

The first consolidated tax return filed by the affiliated group of which petitioner was a member, was the consolidated return for the year 1919, filed May 15, 1920. The tax shown due on that return, amounting to $185,381.91, was assessed against petitioner on June 15, 1920. When this consolidated return was filed, petitioner and each of the subsidiary corporations also filed separate returns for the year 1919. The tax shown due on petitioner's separate return was not assessed but assessments were made against the subsidiaries in the respective amounts shown due on their separate returns. In filing these separate returns, the subsidiaries paid a total of $23,000 as installments on the taxes shown due thereon.

Petitioner paid, during 1920, $162,381.90 of the amount assessed against it on the consolidated return, and on December 15, 1920, filed a claim for abatement of the balance of the said assessment upon the grounds:

That the Louisville Woolen Mills, Louisville, Ky., paid to the Internal
Revenue Collector of Ky., Mar. 1920_____ $17,250
and Park Woolen Mills paid to the Internal Col. at Atlanta, Ga_____   5,750
                                                                      _____
                                                                        $23,000

which payments should apply on consolidated returns filed by the American Textile Woolen Co., Sweetwater, Tenn.

Subsequent to the filing of the above described consolidated and separate returns and to the assessment against petitioner of the amount shown due on the consolidated return, each.of the subsidiaries filed, during 1920, information returns for the year 1919, Form 1122. Question 7 of the said Form 1122 reads:

If apportionment is being made state the amount of income and profits tax for the taxable year to be assessed against the subsidiary or affiliated company making this return ——— $———.

Form 1122, filed by the Park Company for the year 1919, stated as the answer to the said question 7, " $26,324.23." The record does not show whether or not this amount represented an allocation of tax to the Park Company in accordance with the net income and invested capital properly assignable to it or whether it was an arbitrary allocation.

The Park Company on September 9, 1920, filed a claim for abatement of the difference in tax shown due on its separate return for 1919, i. e., $24,836.51, and the $5,750 paid by it when filing that return. The payment last mentioned was claimed by petitioner as a credit on the consolidated tax. The difference between these sums, i. e., $19,086.51, was assessed against petitioner as transferee and was paid by it under protest on March 30, 1929.

The information returns filed by the Athens, Sweetwater and Louisville Companies for the year 1919 left the space for answer to question 7 blank.

February 12, 1921, petitioner executed and forwarded to the respondent returns as follows:

(1) For 1917, a consolidated excess-profits-tax return, Form 1103, disclosing a total profits-tax liability in the amount of $18,128.15.

(2) For 1917, a consolidated return, Form 1031, disclosing a total income and profits-tax liability in the amount of $27,908.26.

(3) For 1918, a consolidated income and profits-tax return, Form 1120, disclosing a total tax liability in the amount of $351,034.14.

The respondent received these returns on February 14, 1921. Since, as above explained, the respondent concedes that the liability of petitioner, if any, for consolidated taxes of the group for the year 1917 relates only to excess-profits taxes, the return numbered (1) above is the only 1917 consolidated return in which we are now interested.

Petitioner denies the existence of an agreement among the members of its affiliated group that the entire tax shown due on its consolidated profits-tax return for 1917, and its consolidated income and profits-tax returns for 1918 and 1919, should be allocated to it. We think, however, that the actions of petitioner and the subsidiaries toward the liabilities indicated upon the returns mentioned are in-

consonant with the belief that there was no such agreement. And as was indicated in *Essex Coal Co., supra,* this agreement need take no set form but may be gathered from the whole record.

Petitioner accepted the assessment against it of the entire liability shown due on the 1919 consolidated return, which was the first consolidated return filed for its affiliated group. Of the $185,381.91 shown due on this return as filed May 15, 1920, petitioner paid during that year $162,381.91 and filed claim for abatement of the balance. This claim was in effect an effort to have credit for certain payments made by two of the subsidiaries on their individual returns applied upon the liability assessed against petitioner on the consolidated return. The tax reported due May 15, 1920, was assessed against petitioner June 15, 1920. September 9, 1920, the Park Company, in its information return, directed that $26,324.23 of the amount shown due on the 1919 consolidated return be assessed against it. The tax had already been assessed against petitioner and, so far as the record indicates, the request of the Park Company for assessment was not complied with. We believe that the assessment should have been made as requested, however, and the assessment against petitioner reduced accordingly. If this was not done, appropriate adjustment will be made on recomputation and the deficiency against petitioner will be disallowed to the extent indicated.

The consolidated returns for 1917 and 1918 were filed February 12, 1921. Notice of a tentative assessment in the amount of $400,885.61 upon these returns and upon the consolidated 1919 return was given petitioner by letter of October 28, 1921. Petitioner paid $100,000 on this tentative assessment on November 17, 1921, and on November 21, 1921, requested assessment for the years involved under section 210 of the Revenue Act of 1917, and sections 327 and 328 of the Revenue Act of 1928. The respondent credited the $100,000 payment on petitioner's 1918 liability.

This was the state of the tax affairs of the consolidated group when on January 18, 1922, the stockholders of the Athens, Park and Sweetwater Companies adopted resolutions directing their respective directors to effect dissolution of those companies.

In the resolutions adopted by the stockholders of the Athens, Park and Sweetwater Companies it was provided that the entire assets of those companies be transferred to petitioner and that petitioner should " assume and pay all the obligations " of the transferors.

Neither the stockholders nor directors of petitioner took any formal action relative to petitioner's acquisition of the said assets. It has been stipulated in this proceeding that petitioner was the sole stockholder of the subsidiaries. The directors of each of the three subsidiaries and of petitioner were the same fifteen men, with the

exception that one of these men was not a director of the Park Company, that concern having one director who apparently had no connection with the other companies of the affiliated group. The officers of petitioner and the subsidiaries were likewise the same persons, with one exception.

Petitioner accepted the transferred assets well knowing that they were transferred upon the provision that it should "assume or pay all the obligations" of the transferors, and well knowing that all three of the companies making such transfers were dissolved or about to be dissolved and left without means of paying such obligations.

By letter of June 14, 1922, the respondent advised the petitioner that as a result of reconsideration of the consolidated tax liability for the years 1917, 1918 and 1919, the proposed deficiency indicated in the letter of October 28, 1921, was reduced from $400,885.61 to $299,053.64.

Petitioner entered upon its books as its own liabilities all such liabilities of the transferors as had customarily been carried upon the latters' books. We attach no weight to the fact that upon advice of their auditor the companies were of opinion that they were entitled to refunds for the tax years in controversy, and, therefore, did not contemplate that tax liabilities were among those assumed by petitioner in accepting the transferred assets. Nor is the fact that liability for the taxes now in controversy was not carried on the books of any of the companies important. It has been shown that it was not the practice of these companies to carry on their books tax liabilities other than those shown due upon their returns. Ignoring tax liabilities does not avoid them.

It is argued that the word " obligations " as used in the resolutions adopted by the Park, Athens and Sweetwater stockholders was intended to include only " commercial obligations." It does not appear, however, that at the time the resolutions were adopted such a limitation was expressed, either in writing or in discussion among the officers and directors. We are disposed to regard it as a limitation engendered in retrospect and wholly ineffective.

The circumstances surrounding the dissolution of the Athens, Park and Sweetwater Companies and the transfer of their assets to petitioner, indicate, we believe, that an understanding existed among the companies involved that petitioner would be liable for the taxes of the three subsidiaries. Such an understanding we regard as the agreement contemplated in the law and regulations. However, we do not rest our determination upon this point alone. We are of opinion that the entire history of the consolidated returns of the affiliated group for the years 1917, 1918 and 1919 indicates an agreement among the affiliates, either active or passive, that the consolidated income and profits taxes of the group be allocated to petitioner, and

this means that our determination involves the Louisville Company as well as the three subsidiaries just discussed.

Whatever their method of handling other business affairs may have been, it is clear that the subsidiaries looked to the petitioner for the conduct of their consolidated tax matters. Petitioner assumed this burden, accepted the assessment against itself of such liabilities of the consolidated group as it believed proper assessments, and paid the same. From the time that the first consolidated return, that for 1919, was filed in May, 1920, until a conference before the Special Advisory Committee in December, 1928, more than eight years later, no objection was ever entered to the respondent's allocation to petitioner óf the entire consolidated tax liability for the years involved. During the eight-year period mentioned there was almost continuous correspondence between the petitioner and the respondent, various protests were filed, and certain conferences were held. And during that period, on December 5, 1925, appeal Docket No. 9689, relating to the years 1917, 1918 and 1919, was filed, with no mention of the issue now under discussion. This issue was first raised by a second amended petition filed January 29, 1929. It may be that the affiliates planned to pay the tax in such proportions as their respective net incomes bore to the consolidated net income or in accordance with an allocation upon some other basis. The question before us relates not to the payment of the tax, but to an agreement among them as to its assessment. *Essex Coal Co., supra.* Therefore, the fact that the Louisville Company supplied part of the $100,000 paid by petitioner on November 17, 1921, would not be of importance even if we were advised of the arrangement under which the money was furnished, i. e., whether it was a loan to the petitioner or a contribution toward the consolidated tax liability.

Petitioner argues that even if a parent corporation agrees to the allocation to it of the entire consolidated tax shown due on the affiliated returns, this does not mean that deficiencies of the group determined many years later may be so allocated under the same agreement, because it might happen that when such deficiencies are determined the interest of the parent in the subsidiary had ceased through change of ownership or otherwise. In the instant proceeding, however, petitioner was the sole stockholder of the subsidiaries during all of the tax years involved, was the sole stockholder and presumably the sole distributee upon dissolution of three of them, and was the sole stockholder of the fourth when the proceeding was heard. Minor stockholdings must have existed for qualifying purposes, but on the record they were purely nominal. The interests of petitioner and the subsidiaries are one.

Discussion of each factor influencing our determination is impracticable because the factors are too numerous. Our decision is

**698**

not based upon the theory of estoppel advanced by the respondent, and to the extent that it may result in the payment of consolidated taxes upon income on which taxes have already been paid by the companies severally, is reluctantly rendered. We are, however, of opinion that there existed among the petitioner and its subsidiaries an agreement that consolidated tax liabilities of the affiliated group for the years 1917, 1918, and 1919 should be allocated for assessment to petitioner alone. See *Bermont Oil Co.*, 22 B. T. A. 182, and cases cited therein.

Petitioner sought to show that its officers and directors were unaware of the statutory provisions relative to allocations of taxes among members of an affiliated group until advised of such provisions shortly before the second amended petition was filed. This explanation is offered as the reason no protest against allocation of the entire consolidated taxes of the group to petitioner was made prior to December, 1928.

In view of the fact that the Park Company's information return for 1919, filed on September 9, 1920, indicated an allocation of a portion of the consolidated tax to it, the petitioner must have been aware it could have objected to the assessment of the entire consolidated tax against itself. The respondent's allocations are accordingly approved, except as hereinbefore noted.

Reviewed by the Board.

*Judgment will be entered under Rule 50.*